In the Matter of the Estate of ALEXANDER K. HONE, Deceased.

Surrogate's Court, Monroe County, June 25, 1934.

*Harold P. Burke,* for the trustee.

FEELY, S. This testamentary trustee, in the judicial settlement of its account at the death of the life beneficiary, is con-

fronted by doubt as to the proper allocation of its charge for payment of the ordinary city tax for the current year 1934, as between the estate of this deceased life beneficiary and the remaindermen. The widow of testator died February 6, 1934, thirty-seven days after this tax became a lien. Her use having then ceased, the question is whether her estate, that has no further rights in the premises, must nevertheless bear this ordinary carrying charge on the remaindermen's property for the ensuing eleven months after her death, or whether the burden is to be apportioned in the same manner that her beneficial use was.

Among the items of testator's abundant generosity to his widow is the direction in his last will to his trustee to pay his widow, in equal monthly or quarterly installments, as she might elect, the net income from a building he owned at Main and Water streets, Rochester, for and during the term of her lifetime. Being central property, its assessed valuation is high; and the ordinary tax thereon for the year 1934 amounted to $7,696.48. This was assessed, not against the life tenant nor the trustee, but against " Alexander Hone Est. et al." In that form it was a liability only on the land, because Alexander Hone had died at least five years before. This tax was laid for the ordinary city expenses for the calendar year 1934. It became a lien January first; but is not required to be paid all in advance. It may be paid in four installments, approximately equal in amount, the first on January first, the second on April first, the third on July first, and the last on September first, with interest only from and after the end of those respective months on the installment then payable. Occasionally, arrears of local assessments for permanent improvements, and arrears for water as of September of the previous year, are included as definite and separately itemized parts of this levy. These possible items are outside the scope of this discussion.

The correlation of the term of a testamentary or a statutory life use both to those benefits to it having fixed terms like rents or annuities, and also to those burdens upon it having fixed periods like the annual ordinary taxes, or fire insurance, is a balanced relation that rests upon equitable principles in this State, for it is only as to the periodic benefits that our statute (Surr. Ct. Act, § 204) was enacted in 1875 in order to remove any doubt as to the application to wills thereafter executed of the technical rules of the common law. (*Matter of Juilliard*, 238 N. Y. 499, 509; *Kearney* v. *Cruikshank*, 117 id. 95, revg. 46 Hun, 219.) The act of 1875 shows " an omission of all reference to taxes and other charges of like character against real estate " (*Equitable Life Assur. Soc.* v. *Toplitz*, 69 Misc. 457, 462); so, the companion question of

apportioning at the end of the life estate the ordinary periodic burdens has never, so far as the examination in this case discloses, been decided in this State, if the *Matter of Schulz* (133 Misc. 168) be regarded as having been predicated upon an intention on part of the testator that his widow be given more than the privileges of an ordinary life tenant, inasmuch as she was given a right to invade principal, which does not exist in the case at bar. (See *Matter of Limburger*, 128 Misc. 577; 137 id. 54 55.)

This involvement of the principal or fee itself is the basis on which our courts have allowed an apportionmeet of an assessment for a permanent improvement as between the remainderman and the life tenant, in whose term the assessment was confirmed. (See 83 A. L. R. 793, 797, and *Gunning* v. *Carman*, 3 Redf. 69, cited in *Schulz Case, supra*.)

As to ordinary taxes, " the duty that the life-tenant owes the remainderman does not spring from privity of estate or by covenant, but is an incident to the life estate." (*Sweeney* v. *Schoneberger*, 111 Misc. 718, 725.) It is an incident of equitable origin. Some of our courts have followed Chancellor KENT in his statement (4 Kent Comm. 75) that it is " out of the rents and profits " that the life tenant must keep down interest on incumbrances. This has suggested the question, What if there were no rents? As to this, the case last cited continues: " The legal expectation is that the property will reach the remainderman unwasted, that is, unimpaired by an unthrifty or injurious use by the life tenant either in act or omission. But does the life tenant assure that the property will come to the remainderman in as good state of repair and as free from incumbrances as it was received? May he leave it unused, if without substantial improvement it has no valuable use, and in such case let the interest and taxes accumulate? If it has potential rental value, but no actual rental value without expenditure in money or labor to give it restoration, or new form or adaptation, must the life tenant supply the means, or the labor, or both? There are several phases of the subject and some embarrassing questions, if the rule of qualified liability be accepted. I have suggested some of them. But it is not necessary to make definite decision." (THOMAS, J., in *Sweeney* v. *Schoneberger, supra*.)

In this direction our courts have already made the definite advance of holding that where the property is unproductive, the burden of taxation should be borne by the remainderman rather than by the life tenant. (17 A. L. R. 1394, citing *Spencer* v. *Spencer*, 219 N. Y. 459; *Furniss* v. *Cruikshank*, 230 id. 495; *Matter of Martens*, 16 Misc. 246; *Matter of Montgomery*, 99 id. 473; *Matter*

*of Vermilye,* 100 id. 235; *Matter of Lichtenberg,* 114 id. 89; *Matter of Arnolt,* 127 id. 579, 589.)

Upon this correlative basis, that no burden is entailed where no benefit has been derived, the courts of some States have ruled that the ordinary tax is to be apportioned between the life tenant and the remainderman when the life tenant dies before the expiration of the year for which the tax was levied. (17 A. L. R. 1397, 1398, citing *Crump's Estate,* 13 Pa. Co. Ct. 286; 2 Pa. Dist. Rep. 478; also *Fest's Estate,* 28 W. N. C. [Pa.] 415; and *Rhode Island Hospital Trust Co.* v. *Harris,* 20 R. I. 408.) These cases are discussed in the *Schulz Case* (*supra*). In other States the courts still hold fast to the technical common-law rule that the life tenant or his estate is liable for taxes, if he was alive on the day the taxes became a lien, although he died before the expiration of the period covered by the taxes. (17 A. L. R. 1397.) No New York case has been found that is squarely in point. Most of them relate to the case of a tax for which testator himself was personally liable before the inception of the life estate; others depend upon peculiar provisions in each will. In *Griswold* v. *Griswold* ([1857] 4 Bradf. 216) a time apportionment of an annuity was denied under the common-law rule, but as to the burdens the surrogate said: " The devise to the testator's widow of the use of his dwelling house was made subject to the discharge of the taxes by the life tenant." This express charge manifested an intention adverse to the widow's claim that the taxes fell upon the estate. The surrogate there added: " In all cases, taxes due at the time of the death of the deceased person are payable out of his personal estate; and taxes accruing subsequently are chargeable upon the land.

" There is no rateable division or apportionment, but the entire tax becomes due and must be paid, according to the rule first stated."

As to that, the comment of the Court of Appeals in another case was this: " It is not entirely clear whether the surrogate intended to hold the widow liable to pay the taxes or the estate, or whether if he held the widow liable, it was by virtue of the devise making the land subject to the discharge of taxes or because he thought the taxes were not due. If the latter, we think he was clearly wrong." (*Matter of Babcock,* 115 N. Y. 450, 458.)

In *Matter of Babcock* ([1889] 52 Hun, 142) testator devised his land to third persons, subject to an annuity to his widow. Three days before he died the assessors certified tax rolls on both real and personal estate to the board of aldermen, carrying taxes against the testator in the sum of $5,400 for the then current year 1887. The executors charged this tax against the corpus, and to this the

remaindermen excepted. VAN BRUNT, J., said: " There is no question but that the annual charges and taxes imposed on property must always be borne by the life tenants upon the theory that each estate must bear its own burdens. But upon an examination of the facts in this case it appears that this rule is entirely inapplicable for the reason that the *corpus* of an estate must bear the burdens of its debts, and at the time of testator's death he had become personally liable for the payment of this tax, entirely independent of the question as to whether it was or was not a lien upon the real estate. * * *

" In fact, it appears that the testator did not die until half of the year 1887 had passed. The tax was for the whole year, and there does not seem to be any justice in charging the life tenant with a tax for the whole when they get only the income for the half, unless we are required to do so on principles, the authority of which should not be interfered with. But it seems to us that the question is not open to discussion."

There the court felt bound by the ruling in *Rundell* v. *Lakey* (40 N. Y. 513) to the effect that where a deed was delivered after the roll had been completed and before the tax became a lien, a promise by the grantors to refund the tax if they " were legally bound to pay it," was actionable. This, obviously, differs from the case at bar; and this ruling was distinguished in *Barlow* v. *St. Nicholas Bank* (63 N. Y. 399): " The distinction between the time at which the personal liability to pay the tax accrues and the time at which the tax becomes a lien upon the lands being very apparent." The *Detmold* [*Matter of Babcock*, 52 Hun, 142] case was affirmed in the Court of Appeals under the title *Matter of Babcock* (115 N. Y. 450), citing the *Griswold* case and *Rundell* v. *Lakey*.

The factor of wild land enters into *Matter of Young* ([1896] 17 Misc. 680) where the will directed the executors to keep intact a large estate which consisted in part of wild and uncultivated land; and the will directed the executors to pay to the widow ninety per cent of the net income, but to add the ten per cent to the estate. At testator's death there were taxes unpaid on the wild land, and later some taxes accrued against it and also his other lands. There was no way by which the productiveness or relative productiveness of certain portions of the real estate could be estimated and compared. Moreover, testator had treated his estate as a whole, to be held intact. It was held there that the back taxes which accrued prior to the death of the testator constitute a debt of the estate and should be paid from principal; but that the taxes accruing subsequent to testator's death must be paid from income.

In *Clarke* v. *Clarke* (145 N. Y. 476) the intention was clear that in no event, save one, should the widow's life estate be chargeable with taxes. In *Deraimes* v. *Deraimes* (72 N. Y. 154) a direction to the executors to pay taxes was construed not to be specific enough to relieve the widow as life tenant from this charge. In *Gould* v. *Gould* (126 Misc. 54, 69) the will gave the life use of testator's residence, " free of taxes," but as the trust estate otherwise was producing a superabundant income, these taxes were charged to it, rather than to corpus. " The trust estate was producing an annual income of upwards of $3,000,000, and there is no room for the inference that the testator intended that this large income should not pay " taxes, at the rate of $6,000 a month.

Aside from cases where a specific intention is expressed, these cases present, as regards testator's fixed tax debts, already personally binding upon him, the situation of the life tenant at the inception of his term, with all of his beneficial use still ahead of him. This differs greatly from the situation brought about when death ends the use and enjoyment of the life tenant. Neither he nor his estate has then any further benefit forthcoming; and no benefit being derived, no burden should be entailed as regards the time following the death of the life tenant. In the case at bar this life beneficiary of the net income of a specific piece of land was not personally liable for the taxes in question, either to the city or to the trustee. The city, by assessing its tax against a dead man, acquired only a lien against the property alone. The trustee had no right to charge the tax against the widow beneficiary until two conditions had first been met, namely, that the rentals had been enough to enable the trustee to pay the tax, and that the trustee had actually paid the tax. If not enough rental had been received, there would be no personal liability on the life beneficiary to advance or put up the money necessary to enable the trustee to pay these ordinary carrying charges on the vacant or unproductive block, the taxes meantime on which in that case would fall to the remaindermen to pay; and the remaindermen would have no recoupment until some rentals were thereafter received to which the life beneficiary might lay claim on the score of " net income." The petitioner argues that the tax would have to be paid before the net could be ascertained. Even if this were so, it is not material. It looks to protection from interest and penalties, rather than to the underlying rights of the parties, whenever the " net " is to be ascertained. The tax roll fixed the amount at the outset as between the trustee and the life beneficiary, but the trustees were not obliged to pay it all in at once.

In *Matter of Albertson* (113 N. Y. 434), upon which the petitioner relies herein, no apportionment was possible, because none of the school or farm taxes there in question had been assessed in or for the year in which the widow, life tenant, died; and no claim whatever was made for apportionment. Testator died June 5, 1878, and his widow died August 2, 1881. The disputed payments by the trustees were for school taxes for 1878, 1879 and 1880, and the farm taxes for the same calendar years. The 1880 farm tax was paid January 11, 1881, for the year then wholly past; and during that year the widow had been in occupancy, rent free, and had accepted the other net rentals. Those taxes had all been paid to her knowledge and without objection on her part. The first objection was made five years after her death, by her executors. The point of estoppel was raised by the remaindermen, nephews and nieces; but the ruling was based on a construction of the will. The widow was given the use of the farm, rent free, together with the rents of other land, so long as she lived; and the will directed the trustees to pay, from time to time as the same shall accrue and become necessary, all taxes upon the farm, " out of the estate." This word " estate " was held not to be specific enough to free her other rents from paying these taxes. This and like rulings, *e. g.*, *Matter of Shipman* (82 Hun, 108, 116), have been superseded, as shown in the cases cited in *Matter of Mills* (148 Misc. 224), by the more liberal reading of similar provisions so as to favor the surviving spouse. In neither aspect is this *Albertson* case pertinent now, either as regards the nature of the tax, or the scope of such a testamentary provision. This *Albertson* case is the only case so far found wherein the life estate had expired before the question was raised.

The question of final apportionment, therefore, appears to be an open one, especially on the peculiar facts of this case. This tax was against a man long since dead, and was never a personal liability on any one; but only a lien on the land. The trustee had the option to pay it in four installments, on the quarter days, without interest or penalty in any case. In the first quarter of the year for which this tax was laid in advance to meet ordinary charges, the life beneficiary of the net income of the land which was subject to the tax died, and her right to the net rentals then accrued was then apportioned, and was terminated as regards those thereafter to accrue. As to the eleven months after the death of the life beneficiary, no benefits or rentals accrued to the estate of the deceased life beneficiary; and no burden was entailed upon her estate to pay the ordinary taxes for the period in which no rentals could possibly accrue to it; but as to such subsequent

period, the ordinary carrying charges should, after having been apportioned on an equitable basis, be borne by the remaindermen to whom those subsequent rentals belong. The trustee was not obliged to pay all this tax in advance; but having done so, should now apportion the same on the basis of 37/365ths, or $780.19, against the estate of the deceased life tenant, and 328/365ths, or $6,916.29, against the remaindermen. Any arrears for water should be charged to the decedent's estate; and any items for arrears of installments for public improvements should be all charged to the remaindermen.

Enter the decree in accord with this decision.